UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

MAC WILLIAM BISHOP and       :
CHRISTOPHER CHIVERS,         :
                                          :
                Plaintiffs,         :
                                          :         13 Civ. 8620 (GWG)
                                          :
            - against -           :
                                          :
UNITED STATES DEPARTMENT OF   :
HOMELAND SECURITY,         :
                                          :
                Defendant.         :

———————————————————————————— x


**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANT'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

David E. McCraw, Esq.
D. Victoria Baranetsky, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

Attorneys for Plaintiffs

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT.......................................................................................................................5

I.     DHS'S PARTIAL DENIAL OF PLAINTIFFS' FOIA REQUESTS IS SUBJECT TO *DE NOVO* REVIEW.......................................................................................................5

II.    DHS HAS FAILED TO JUSTIFY THE WITHHOLDING OF INFORMATION UNDER EXEMPTION 7(E).......................................................................................7

      A.    The Result Redactions ......................................................................................9

      B.    The Secondary Inspection Reports .................................................................11

      C.    The ATS Reports ...........................................................................................14

III.   AT A MINIMUM, THE COURT SHOULD CONDUCT AN *IN CAMERA* REVIEW OF THE WITHHELD MATERIAL.........................................................................18

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

## *CASES*

*ACLU Found. v. U.S. Dep't of Justice*, Nos. 86-6052, 86-6058, 2014 U.S. Dist. LEXIS 32615 (S.D.N.Y. Mar. 11, 2014) ...........................................................................................................12

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678 (2d Cir. 2010) ..............................................................................................................................................7

*American Immigration Lawyers Assn. v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66 (D.D.C. 2012) ..................................................................................................................................... 15-16

*Assoc. Press v. U.S. Dep't of Defense*, 554 F.3d 274 (2d Cir. 2009).................................................6

*Assoc. Press v. U.S. Dep't of Defense,* 498 F. Supp. 2d 707 (S.D.N.Y. 2007)..............................19

*Barnard v. Dep't of Homeland Sec.*, 531 F. Supp. 2d 131 (D.D.C. 2008) .....................................17

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143 (2d Cir. 2010)............................................................................................................5, 6

*Bryant v. Maffuci*, 923 F.2d 979 (2d Cir. 1991) ................................................................................6

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) .............................................8, 12

*Carney v. U.S. Dep't of Justice,* 19 F.3d 807 (2d Cir. 1994)......................................5, 6, 8, 11, 12

*Doherty v. U.S. Dep't of Justice*, 775 F.2d 49 (2d Cir. 1985) ..........................................................7

*Donovan v. FBI*, 806 F.2d 55 (2d Cir.1986)......................................................................................9

*El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285 (D. Conn. 2008) ............................19

*Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157 (D.D.C. 2011) ............................16

*Ferri v. Bell*, 645 F.2d 1213 (3d Cir. 1981).................................................................................7, 13

*Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999) ...............................................................2

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)..................................................18

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) .............................................................................5, 18

*Hayden v. Nat'l Sec. Agency,* 608 F.2d 1381 (D.C. Cir. 1979) ........................................................8

*Hopkins v. U.S. Dep't of Housing & Urban Dev.*, 929 F.2d 81 (2d Cir. 1991)................................9

*Kanter v. IRS,* 433 F. Supp. 812 (N.D. Ill. 1977) ........................................................................8

*King v. U.S. Dep't of Justice,* 830 F.2d 210 (D.C. Cir. 1987) ......................................................8

*Long v. Office of Pers. Mgmt.,* 692 F.3d 185 (2d Cir. 2012) ........................................................8

*Mead Data Cent., Inc.v. U.S. Dep't of Air Force,* 566 F.2d 242 (D.C. Cir. 1977).......................16

*Nat'l Sec. Archive v.* FBI, 759 F. Supp. 872 (D.D.C. 1991)..........................................................7

*PHE v. U.S. Dep't of Justice,* 983 F.2d 248 (D.C. Cir. 1993) .......................................................8

*Powell v. U.S. Bureau of Prisons,* 927 F.2d 1239 (D.C. Cir. 1992) .............................................16

*Ray v. Turner,* 587 F.2d 1187 (D.C. Cir. 1978)...........................................................................18

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980).......................................................2

*Rosenfeld v. U.S. Dep't of Justice,* 57 F.3d 803 (9th Cir. 1995).............................................7, 12

*Skinner v. U.S. Dep't of Justice,* 806 F. Supp. 2d 105 (D.D.C. 2011)..........................................15

*Soucie v. David,* 448 F.2d 1067 (D.C. Cir. 1971)..........................................................................9

*Strunk v. U.S. Dep't of State,* 905 F. Supp. 2d 142 (D.D.C. 2012)..........................................11 n.3

*Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106 (D.C. Cir. 2007) ...........................................9, 16

*Sutton v. IRS,* No. 05 C 7177, 2007 U.S. Dist. LEXIS 299 (N.D. Ill. Jan. 4, 2007).....................19

*Tigue v. U.S. Dep't of* Justice, 312 F.3d 70 (2d Cir. 2002).........................................................18

*Twist v. Ashcroft,* 329 F. Supp. 2d 50 (D.D.C. 2004), *aff'd sub nom. Twist v. Gonzales,* 171 F. App'x 855 (D.C. Cir. 2005)......................................................................................................19

*United States v. Lam,* No. 3:07-CR-374, 2011 U.S. Dist. LEXIS 33351 (E.D. Va. March 28, 2011) ...........................................................................................................................................17

*United States v. Reyes-Bernal,* CR No. 10-1365-R, 2011 U.S. Dist. LEXIS 18169 (C.D. Cal. Feb. 24, 2011) .............................................................................................................................17

*U.S. Dep't of Air Force v. Rose,* 425 U.S. 352 (1976) ..................................................................6

*U.S. Dep't of State v. Ray,* 502 U.S. 164 (1991)...........................................................................6

*Wilkinson v. FBI,* 633 F. Supp. 336 (C.D. Cal. 1986) ...................................................................8

*Wilner v. Nat'l Sec. Agency,* 592 F.3d 60 (2d Cir. 2009) ..............................................................5

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) .................................................................................5, 6

## *STATUTES*

Fed. R. Civ. P. 56(a) .........................................................................................................6

5 U.S.C. § 552(a)(4)(B) ................................................................................................5, 18

5 U.S.C. § 552(b).............................................................................................................9

5 U.S.C. § 552(b)(7)(E) ............................................................................................. *passim*

## *OTHER AUTHORITIES*

U.S. Dep't of Homeland Security, CBP Directive No. 3340-049, Border Search of Electronic Devices Containing Information (2009), *available at* http://www.cbp.gov/sites/default/files/ documents/elec_mbsa_3.pdf.........................................................................................13

U.S. Dep't of Homeland Security, Privacy Impact Assessment for the Automated Targeting System (2012), *available at* http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_ ats006b.pdf...........................................................................................................13 n.4

Susan Stellin, *The Border is Now a Back Door for U.S. Device Search*, N.Y. Times, Sept. 19, 2013, http://www.nytimes.com/2013/09/10/business/the-border-is-a-back-door-for-us-device-searches.html....................................................................................................13 n.4

Susan Stellin, *Airport Screenings Concern Civil Liberties Groups*, N.Y. Times, March 11, 2013, http://www.nytimes.com/2013/03/12/business/passenger-screening-system-based-on-personal-data-raises-privacy-issues.html...................................................................................13 n.4

Susan Stellin, *Security Check Now Starts Long Before You Fly*, N.Y. Times, Oct. 21, 2013, http://www.nytimes.com/2013/10/22/business/security-check-now-starts-long-before-you-fly.html..................................................................................................................13 n.4

Plaintiffs Mac William Bishop and Christopher Chivers (the "Journalists") respectfully submit this memorandum of law in support of their cross-motion for summary judgment and in opposition to Defendant's motion for summary judgment.

## PRELIMINARY STATEMENT

On May 24, 2013, Mr. Bishop and Mr. Chivers, journalists working for The New York Times, were on their way to Turkey to cover the civil war in Syria when they were pulled aside at their boarding gate at John F. Kennedy International Airport ("JFK") for questioning by officers working for Defendant Department of Homeland Security ("DHS"). Subsequently, on June 6, 2013, Mr. Bishop was subjected to further segregated questioning by DHS employees at customs at JFK upon his return to the United States.

No one questions the government's authority to monitor our international borders and ensure the safety of our nation. But the questioning of working journalists by government agents under any circumstances raises special concerns, and the courts play a role in assuring that bounds are not overstepped. Here, this Court should review whether the government surveilling journalists' reportorial activities in hopes of gaining intelligence on events or people in the news? Have the journalists' communications with confidential sources been monitored? Is the specter of governmental questioning designed to have a chilling effect on the movements and activities of journalists who are working on sensitive international stories?

In other circumstances—those involving subpoenas on the press—the Second Circuit has recognized the harm that is done by the intrusion of the government (as well as others) into the work of journalists: "If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure . . . to sift through press files in search of

information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny . . . could otherwise impair [the press's] ability to perform its duties. . . . And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 35 (2d Cir. 1999).

The Freedom of Information Act ("FOIA") requests here are designed simply to assure that no improper motive or method was involved in the questioning of the Journalists. An appropriate level of transparency—consistent with FOIA and calibrated to be sensitive to legitimate law enforcement needs—would put to rest any doubt about the nature of the questioning that was done. As Chief Justice Burger once observed, "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980).

## STATEMENT OF FACTS

### *The Chivers Request*

On June 27, 2013, following his stop and questioning at JFK, Mr. Chivers filed a FOIA request (the "Chivers Request") with DHS headquarters requesting all information and records in the possession of DHS concerning him. (Ex. B to Declaration of David E. McCraw ("McCraw Dec."), dated May 12, 2014.) On July 3, 2013, DHS stated in a letter that it "cannot conduct an adequate search" because "DHS does not maintain a central index of records about individuals" and requested more information. (Ex. C to McCraw Dec.) On August 9, 2013, through counsel,

Mr. Chivers objected to DHS's position and restated that he was seeking any documents that may be in the control of DHS. (Ex. D to McCraw Dec.)

On August 22, 2013, DHS notified Mr. Chivers that the agency had transferred the Request to the FOIA officers for two of its units, the Transportation Security Administration ("TSA") and Immigration and Customs Enforcement ("ICE"). (Ex. E to McCraw Dec.) DHS apparently did not ask Customs and Border Protection ("CBP"), a third DHS entity, to do a search and gave no reason for that peculiar decision. (McCraw Dec. ¶ 8.) Neither TSA nor ICE provided a substantive response to the Chivers Request or produced any documents prior to the commencement of this action. (McCraw Dec. ¶ 9.) However, on November 13, 2013, ICE granted the Chivers Request expedited-processing status after initially being unable to locate the Request in response to an update inquiry from counsel for Mr. Chivers. (McCraw Dec. ¶ 10 and Ex. F thereto.)

*The Bishop Request*

On July 10, 2013, following his two stops and questioning at JFK, Mr. Bishop through counsel filed a FOIA request (the "Bishop Request") with DHS headquarters requesting all information and records in the possession of DHS concerning him. (Ex. G to McCraw Dec.) Without any notification to Mr. Bishop or his attorney, DHS apparently transferred the request to ICE and TSA. (McCraw Dec. ¶ 12.) There is no indication that DHS requested that CBP also search its records. (McCraw Dec. ¶ 12.)

On September 27, 2013, ICE denied the Bishop Request. (Ex. H to McCraw Dec.) ICE reported in a "final response" that the unit had conducted a search and found no responsive documents. On October 28, 2013, Mr. Bishop appealed ICE's denial. (Ex. I to McCraw Dec.)

In his appeal letter, Mr. Bishop said it was "inconceivable that DHS has no records pertaining to [him]" as someone who is "a frequent international traveler." (Ex. I to McCraw Dec.) He pointed out that on June 6, 2013 he had answered questions for DHS employees in a private room at JFK, and those answers were recorded on a computer. (Ex. I to McCraw Dec.) On November 18, 2013, ICE denied Mr. Bishop's administrative appeal, finding that the agency had done an adequate search. (Ex. J to McCraw Dec.)

The TSA, meanwhile, informed Mr. Bishop by letter on July 31, 2013 that his "request was too broad in scope." (Ex. K to McCraw Dec.) TSA requested more information before processing the request. On August 9, 2013, Mr. Bishop, through counsel, responded by letter restating his initial request and asserting that no legal authority supports the proposition that TSA could simply refuse to do the search. (Ex. L to McCraw Dec.)

More than two months later, on October 23, 2013, TSA told Mr. Bishop's counsel that it could not find the August 9, 2013 letter. (McCraw Dec. ¶ 18.) Counsel subsequently provided a new copy of the letter and additional information about the questioning at JFK. (McCraw Dec. ¶ 18 and Ex. M thereto.) No further response from TSA was forthcoming prior to the filing of this lawsuit. (McCraw Dec. ¶ 19.) (A copy of the Complaint is attached as Ex. A to the McCraw Dec.)

*Subsequent Actions on the Requests*

Following commencement of this action, counsel for the Government and for Plaintiffs engaged in discussions that led to the release of hundreds of pages of redacted documents responsive to both requests, including—significantly and for the first time—materials held by CBP. (McCraw Dec. ¶ 20.) Plaintiffs subsequently waived their objections to certain redactions, and three issues remain for resolution by the Court (McCraw Dec. ¶ 21):

- Redaction of the "results of query" field (designated "RSLT") in the following documents (the "Result Redactions"): CBP0002 – CBP0014; CBP0029; CBP0091-CPB0093; CBP0110 – CBP0115; CBP0119; CBP0140 – CBP0143). (*See* Declaration of Laurence E. Castelli, dated April 18, 2014 ("Castelli Dec.), ¶ 19 and Ex. C thereto.)

- Redaction of secondary inspection records (the "Secondary Inspection Records"): CBP0091 – CBP0093; CBP0140 – CBP0143. (*See* Castelli Dec. ¶ 20 and Ex. C thereto.)

- Withholding of two complete pages (the "ATS Reports") from the Automated Targeting System ("ATS"): CBP0265 – CBP0266. (*See* Castelli Dec. ¶ 21 and Ex. C thereto.)

In each instance, Defendant has relied upon FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), which is applicable to certain law enforcement information.

## ARGUMENT

### I.

### DHS'S PARTIAL DENIAL OF PLAINTIFFS' FOIA REQUESTS IS SUBJECT TO *DE NOVO* REVIEW

FOIA requires that courts review *de novo* agency decisions to withhold information from the public. 5 U.S.C. § 552(a)(4)(B). As a result, the agency's decision is given no deference by the court. *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010). Although courts review reasonably detailed agency affidavits with a presumption of good faith, this primarily is for determining the need for further fact-finding. *See, e.g., Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812-13 (2d Cir. 1994); *see also Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69, 73 (2d Cir. 2009) (presumption does not replace *de novo* review by courts); *Halpern v. FBI*, 181 F.3d 279, 287-88 (2d Cir. 1999); *cf. Bloomberg*, 601 F.3d at 151 ("[A] test that permits an agency to deny disclosure

because the agency thinks it best to do so (or convinces a court to think so, by logic or deference) would undermine 'the basic policy that disclosure, not secrecy, is the dominant objective of [FOIA]'" (quoting *U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

"The 'basic purpose [of FOIA] reflected a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Bloomberg*, 601 F.3d at 147 (quoting *Rose*, 425 U.S. at 360-61). In light of this purpose, "FOIA exemptions are to be construed narrowly, 'resolving all doubts in favor of disclosure.'" *Assoc. Press v. U.S. Dep't of Defense*, 554 F.3d 274, 283 (2d Cir. 2009) (quoting *Wood*, 432 F.3d at 82-83); *see also Bloomberg*, 601 F.3d at 147. There is a "'strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents.'" *Assoc. Press*, 554 F.3d at 283 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). "That burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document." *Ray*, 502 U.S. at 173; *see also Assoc. Press*, 554 F.3d at 283-84.

FOIA litigation is typically resolved on summary judgment. *See, e.g.*, *Carney*, 19 F.3d at 812. In a FOIA case, as in other litigation, summary judgment is properly granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Bryant v. Maffuci*, 923 F.2d 979, 982 (2d Cir. 1991).[1]

---

[1]  Like Defendant, Plaintiffs have not submitted a Local Rule 56.1 statement in accord with the practice in FOIA cases in this District. (*See* Government's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") at 1 n.1.)

## II.

### DHS HAS FAILED TO JUSTIFY
### THE WITHHOLDING OF INFORMATION
### UNDER EXEMPTION 7(E)

Exemption 7(E) protects from disclosure records or information compiled for law enforcement purposes to the extent that disclosure "would reveal techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions, if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). As Defendant correctly notes, the qualifying clause concerning circumvention has been interpreted to apply only to "guidelines" and not to "techniques and procedures." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010). The phrase "techniques and procedures" refers to "how law enforcement officials go about investigating a crime." *Id.* at 682.[2]

However, there are important limitations on when Exemption 7(E) can be invoked. <u>First</u>, the exemption covers only investigatory records that disclose investigative techniques and procedures *not generally known* to the public. *See Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995); *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985); *Ferri v. Bell*, 645 F.2d 1213, 1224 (3d Cir. 1981); *Nat'l Sec. Archive v. FBI*, 759 F. Supp. 872, 885 (D.D.C. 1991). Routine techniques and procedures already well known to the public may not be withheld. *Ferri*, 645 F.2d at 1224.

---

[2]   While the Government argues that the second clause of Exemption 7(E) concerning law enforcement "guidelines" also applies (Def. Mem. at 8), nothing about the information withheld appears to fall within the category of "guidelines" as that term has been construed by the Second Circuit. *See Lowenstein*, 626 F.3d at 682 ("The term 'guidelines'—meaning, according to Webster's Third New International Dictionary (1986), 'an indication or outline of future policy or conduct'—generally refers in the context of Exemption 7(E) to resource allocation").

Second, Exemption 7(E) may not be invoked to shield investigative techniques that are illegal or unauthorized. *See Wilkinson v. FBI*, 633 F. Supp. 336, 349-50 (C.D. Cal. 1986) ("Exemption 7(E) may not be used to withhold information regarding investigative techniques that are illegal or of questionable legality"); *Kanter v. IRS*, 433 F. Supp. 812, 822 (N.D. Ill. 1977) ("FOIA does not shield materials relating to unauthorized or illegal investigative tactics").

Third, as in every FOIA case, the Government's affidavits must be sufficient to carry the agency's burden of proof. While the Government's declarations are accorded a presumption of good faith, they must give "reasonably detailed explanations why any withheld documents fall within an exemption." *Carney*, 19 F.3d at 812; *accord, Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190-91 (2d Cir. 2012). The D.C. Circuit has provided a fuller articulation of the standard and a court's duty in reviewing the declarations:

> A declaration must provide detailed and specific information demonstrating "that material withheld is logically within the domain of the exemption claimed." *King,* [*v. U.S. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987)]. "An affidavit that contains merely a 'categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.'" *PHE* [*v. Dep't of Justice*, 983 F.2d 248, 250 (D.C. Cir. 1993)] (quoting *King*, 830 F.2d at 224). Or as the court stated in *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), "the affidavits must show, with reasonable specificity, why the documents fall within the exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Id.* (footnote omitted). These requirements are consistent with the agency's general obligation to create "as full a public record as possible, concerning the nature of the documents and the justification for nondisclosure." 608 F.2d at 1384.

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

Fourth, even when an agency legitimately asserts that secret techniques or procedures are described in a document, the agency must still disclose the segregable non-exempt parts of the document. If any portion of a document falls outside FOIA's exemptions, that part must be

made public unless it is "inextricably intertwined" with exempt portions. *See, e.g., Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld"); *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85-86 (2d Cir. 1991) (remanding to district court because the government "only asserted in a conclusory fashion that any factual observations contained in the reports are 'inextricably intertwined'"); *Donovan v. FBI*, 806 F.2d 55, 58 (2d Cir. 1986) (agencies must "segregate their disclosable and non-disclosable portions"); *Soucie v. David*, 448 F.2d 1067, 1077-78 (D.C. Cir. 1971) (non-exempt material may be protected only if it is "inextricably intertwined" with exempt information). In 1974, Congress expressly incorporated that requirement into FOIA: "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt. . . ." 5 U.S.C. § 552(b).

The crux of DHS's case is that any further disclosures from the three document sets at issue will reveal the techniques and procedures by which DHS determines when "certain law enforcement actions should be conducted" or the processes by which DHS identifies "high-risk passengers." (Castelli Dec. ¶¶ 19, 20, 22, 23.) Undoubtedly, unique and secret detection techniques are protected from disclosure under FOIA. But the mere invocation of that truism is insufficient to meet the Government's burden. Here, for the reasons detailed below, the Government has failed to make the case to justify its redactions and withholding.

### A. *The Result Redactions*

As shown in Exhibit C to the Castelli Declaration, the TECSII documents list each flight taken by a passenger and provides the passenger's date of birth, the date of the flight, and the destination, as well as some indecipherable (and disclosed) coding. (*See, e.g.*, CBP0002 –

CBP0014.) Of relevance here, the document also includes for each flight a single entry of approximately four characters and/or spaces under the subheading of RSLT, which is in turn under the heading of Query. That entry has been redacted.

The Government avers that the disclosure of the information would "reveal the results of specific law enforcement database queries used by officers in determining if certain law enforcement actions should be conducted." (Castelli Dec. ¶ 19.) Mr. Castelli goes on to say, "If individuals knew the results of queries of relevant databases, this would permit individuals to alter their patterns of conduct, adopt new methods of operation, relocate, change associations, and effectuate other countermeasures, thus, corrupting the integrity of ongoing techniques, operations and investigations, and potentially compromising officer safety." (Castelli Dec. ¶ 19.)

That explanation is neither logical nor plausible. Whatever lies beneath the redaction—and it can be little more than some letters or numbers—is not connected on any given line to security sensitive information nor discloses any law enforcement technique. The RSLT code is linked only to the passenger's name, date of birth, and flight. None of those facts, alone or in combination, when combined with the RSLT entry would seem to provide any information about a government technique or procedure of use to a criminal or terrorist. It would not display the calculus used to reach that result or the method through which that information was obtained.

It is possible that DHS believes some discernible pattern would emerge. But plaintiffs are not required to engage in guessing games about the Government's reasoning. The Government has failed to provide the kind of declaration it must under *Carney* and *Campbell*. Attorneys in civil discovery routinely prepare a non-disclosing privilege log describing the nature of the information in a way that permits the court and opposing counsel to know what a document is about and why it is privileged while preserving confidentiality; there is no reason

the Government cannot do the same in a FOIA case. *See Carney*, 19 F.3d at 812 (agency is required to give "reasonably detailed explanations why any withheld documents fall within an exemption").[3] Instead, DHS does little more than trot out a parade of horribles that might be unleashed if bad people knew the queries that DHS agents do. It fails to show why any one of those horribles would actually be set loose by the disclosure of the RSLT field or even how the disclosure of the result would reveal the nature and scope of a query. That case, if it existed, could be made in a non-disclosing way (by, for instance, discussing how the tiny bit of code could actually show the "specific law enforcement database queries used by officers," as Mr. Castelli avers). But the Government has failed to make it, and on the basis the redactions should be undone.

### B. The Secondary Inspection Records

The Secondary Inspection Records are particularly noteworthy because they focus explicitly on the fact that the Journalists are traveling for reporting purposes. (*See* Ex. C to Castelli Dec., CBP0091-CBP0093 and CBP0140-0143.)

- "[REDACTED] PAX IS REPORTER FOR NY TIMES TRAVELLING TO HATAY TURKEY AND THEN ON TO SYRIA AND FINALLY TO IRAQ. [REDACTION] EXAM IS NEG." (Ex. C to Castelli Dec., CBP0092.)

- "[REDACTED] HE IS PHOTOGRAPHER TRAVELING TO HATAY TURKEY FOR WORK. (NY TIMES) STATES HE IS NOT TRAVELING TO SYRIA. BAG CHECK IS NEG." (Ex. C. to Castelli Dec., CBP0141.)

- "SUBJECT IS A U.S. CITIZEN ARRIVING TO JFK INT'L AIRPORT VIA FLT# TK 3. SUBJECT IS TRAVELING ALONE. STAYING AT NARIN HOTEL, ANTAKYA, TURKEY FOR 12 DAYS. SUBJECT WAS THERE FOR BUSINESS

---

[3] In a prior case, the Government gave a slightly fuller explanation of the RSLT column. *See Strunk v. U.S. Dep't of State*, 905 F. Supp. 2d 142, 148 (D.D.C. 2012). While the Government obtained summary judgment in that *pro se* case, the explanation still falls short of saying definitively what type of information is actually contained in the field and connecting it to a cognizable harm. *Id.* (the RSLT field "could reveal the names of law enforcement databases that were queried at the time of arrival and the results of those queries" and allow circumvention if "individuals . . . knew the meaning of the codes contained in the 'RSLT' column").

MEETINGS AND IS CURRENTLY EMPLOYED BY THE NY TIMES. SUBJECT LIVES AT 45 E. 135TH ST. APT. 12G, NY, NY. HAS GED. MILITARY TRAINING IN 1997-2002. MARINE RESERVES 2010. TRIPS TO MEXICO AND CANADA. (Ex. C to Castelli Dec., CBP0143.)

There are two types of redactions at issue in the Secondary Inspection Records. One is the redaction of the "Reason for Referral." The other is the redaction done in the "Inspection Remarks" republished in the preceding paragraphs. Once again, the Government offers only a conclusory explanation for the redaction in violation of *Carney* and *Campbell*. Mr. Castelli says that further disclosure of the Secondary Inspection Records "would reveal other investigative techniques used by CBP, including examination and inspection procedures and internal reporting requirements, which could be used by potential violators to develop countermeasures to evade detection, inspection, and targeting methods." (Castelli Dec. ¶ 20.)

It is implausible that a few words of text in a description largely devoted to the Journalists' reporting work, as contained in the Inspection Remarks, could be either that revelatory or that harmful. Nor has the Government showed its entitlement to the invocation of Exemption 7(E) by addressing whether the techniques or procedures are truly unknown to the general public—a general public that now has a broad understanding of security protocols at airports in the post-9/11 world. *See Rosenfeld*, 57 F.3d at 815; *see also ACLU Found. v. U.S. Dep't of Justice*, Nos. 86-6052, 86-6058, 2014 U.S. Dist. LEXIS 32615, at *20-*21 (S.D.N.Y. Mar. 11, 2014) (finding Exemption 7(E) does not apply to government memorandum on GPS tracking because disclosure would not reveal any investigative techniques not generally known to the public). The issue is not hypothetical. A large number of surveillance techniques have been discussed recently in the public domain, including government publications (Ex. N to

McCraw Dec.).[4] *See Ferri*, 645 F.2d at 1224 (affidavit's claim of secrecy is "palpably inadequate" in light of evidence that "information on the mechanics of surveillance can already be found in the public domain in various scientific, technical, and government literature").

It is also concerning that the Government does not address the question that illuminates this lawsuit and discussions between counsel: the concern that these stops were targeted at the Journalists because they are journalists going to a part of the world where the Government faces difficult foreign-policy choices. The records released in response to the two Requests show that Mr. Chivers had never been subject to a secondary inspection despite frequent travels to the Russia, Afghanistan, and parts of the Middle East. The Government in its own policies has highlighted that searches of journalists are being conducted and noted that they raise special issues. (*See* Ex. O to McCraw Dec., U.S. Dep't of Homeland Security, CBP Directive No. 3340-049, Border Search of Electronic Devices Containing Information, (2009) ("Other possibly sensitive information, such as . . . work-related information carried by journalists, shall be handled in accordance with any applicable federal law and CBP policy.").)

However, the more fundamental flaw in the Government's papers is that it once again tries to get by with undoubtedly true pronouncements about security—if secret procedures and techniques are revealed, criminals and terrorists will benefit—but fails to draw a logical and plausible connection between the actual redactions done and the harms posited. Does the redacted text in the Inspection Remarks actually refer to a technique or procedure? Is that

---

[4] Reproduced with Exhibit N are the following: U.S. Dep't of Homeland Security, Privacy Impact Assessment for the Automated Targeting System (2012), *available at* http://www.dhs.gov/ xlibrary/assets/privacy/privacy_pia_cbp_ats006b.pdf; Susan Stellin, *The Border is Now a Back Door for U.S. Device Search*, N.Y. Times, Sept. 19, 2013, http://www.nytimes.com/2013/09/10/ business/the-border-is-a-back-door-for-us-device-searches.html; Susan Stellin, *Airport Screenings Concern Civil Liberties Groups*, N.Y. Times, March 11, 2013, http://www.nytimes.com/ 2013/03/12/business/passenger-screening-system-based-on-personal-data-raises-privacy-issues.html; Susan Stellin, *Security Check Now Starts Long Before You Fly*, N.Y. Times, Oct. 21, 2013, http://www.nytimes.com/2013/10/22/business/security-check-now-starts-long-before-you-fly.html.

technique or procedure actually secret?  If the redacted text does not directly mention a technique

or procedure, what, in non-disclosing terms, is a description of its subject matter, and why would

revelation of that subject matter necessarily provide information on a technique or procedure?

Drawing such connections is a necessary part of the burden that the Government has in a FOIA

case.[5]

### C.  The ATS Reports

DHS provides a fuller explanation of the ATS Reports, but one that still falls short of

what the law requires.  (*See* Castelli Dec. ¶¶ 21-25.)  According to DHS, ATS is a computer

system that compares information about travelers to law enforcement and intelligence data

"using risk-based targeting scenarios and assessments."  (Castelli Dec. ¶ 21.)  The system is

used to identify individuals for additional scrutiny.  (Castelli Dec. ¶ 22.)  One part of ATS is a

module known as ATS-P, which maintains data on passengers traveling to and from the United

States on commercial airlines.  (Castelli Dec. ¶ 13.)  ATS-P combines the information provided

by airlines with law enforcement and intelligence information.  (Castelli Dec. ¶ 23.)  DHS says

that ATS-P "displays this combined data in a law-enforcement-sensitive format, showing the

importance that CBP places on different elements and factors in making law enforcement

decisions, as well as the law-enforcement-sensitive underlying such decision-making."  (Castelli

Dec. ¶ 23.)

It is unclear what a "law enforcement-sensitive format" is, and DHS provides no further

explanation.  But more significant are two other gaps in Mr. Castelli's declaration.  First, he

provides no description of what the two documents (designated CBP0265 and CBP0266) are.  Is

---

[5]  Concededly, the second set of redactions—those on the "Reason for Referral"—might refer directly to
a secret technique or procedure or it could be an entry that reveals nothing more than facts unique and
specific to these stops.  DHS's declaration provides no basis for coming to a conclusion as to which it
might be since the declaration describes the material vaguely as "operational information."  (Castelli Dec.
¶ 20.)

one about Mr. Chivers and the other about Mr. Bishop? When were the pages created—before the stops at JFK or after? Are they generic documents about the ATS factors or do they contain specific information about the Journalists? Do they include information obtained from the questioning at the airport? Do they reflect conclusions drawn by DHS agents, or are they merely factual compilations? Are they lists of data entries by factor or do they contain narrative? None of these essential questions is addressed by DHS, even though none of them would require a description or explanation that would reveal secret information. Mr. Castelli's declaration is not close to meeting what the law requires: "reasonably detailed explanations why any withheld documents fall within an exemption." *Carney*, 19 F.3d at 812.

It is instructive to look at a case relied upon by the Government, *Skinner v. U.S. Dep't of Justice*, 806 F. Supp. 2d 105 (D.D.C. 2011), which also involved TECS data. (*See* Def. Mem. at 8-9.) There the declarant provided at least some concrete detail about the content of the requested document: "The TECS screen printout at issue here, among other things, contains a 'all-points bulletin' regarding an ongoing criminal law enforcement operation; a brief profile of the subject of this communication, including his involvement, habits and level of threat; subject tracking; and actions to be taken by law enforcement agents stationed at check points if subjects are encountered." *Id.* at 115. Nothing remotely similar is offered here.

Second, the issue of segregability is given the shortest of shrift in violation of FOIA. Indeed, DHS's declaration about the issue (Castelli Dec. ¶ 25) is strikingly similar to its declaration in another recent Exemption 7(E) case where the court declared that DHS had failed to meet its obligations on segregability. *See American Immigration Lawyers Assn. v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 80 (D.D.C. 2012). *Immigration Lawyers* sets out the relevant standard—a standard not met here: "So important is this [segregability] requirement that

'[b]efore approving the application of a FOIA exemption, the district court *must* make specific findings of segregability regarding the documents to be withheld.'" *Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (quoting *Sussman*, 494 F.3d at 1116)). *Immigration Lawyers* goes on: "The Court errs if it 'simply approve[s] the withholding of an entire document without entering a finding on segregability or the lack thereof.'" 852 F.Supp. 2d at 80 (citing *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 (D.C. Cir. 1992) (citations omitted)).

Among other things, the agency must "describe what proportion of the information in [the] documents, if any, is non-exempt and how that material is dispersed through the document[s]." *Elec. Frontier Found.*, 826 F. Supp. 2d at 174 (citing *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) (internal quotations omitted)). That, of course, is impossible here where the agency has not even described the documents at issue.

In the face of that body of law, Mr. Castelli makes only a categorical assertion that "[n]o information from ATS records can be revealed without disclosing law-enforcement-sensitive information or revealing critical law enforcement techniques, including factors that are considered in identifying individuals who will be subject to additional review." (Castelli Dec. ¶ 25.) Because of the insufficiency of the declaration, we are left to guess what is in the ATS Records. We can assume they include information that is not only *not* sensitive but in fact was released by DHS elsewhere in the document production: the names of the Journalists, their flights, their destinations, their dates of birth. The point is not that such information would be of particular use or interest to the Journalists; the point is that its withholding indicates that DHS has not seriously addressed whether information in the ATS Records can be segregated from data that would expose secret investigative techniques.

DHS well knows that such a conclusory declaration is not permitted. *See Barnard v. Dep't of Homeland Sec.*, 531 F. Supp. 2d 131, 140 (D.D.C. 2008). In *Barnard*, DHS's declarant's "only explanation is that the non-exempt information is 'inextricably intertwined' with the exempt information, and that no portions can be segregated and released without leading to the 'identification of the individuals, techniques, entities, or other items that are properly protected by the exemptions asserted.'" *Id.* The court declared the declaration insufficient because the "explanation fails to even provide a description of the proportion of information in the records that is non-exempt, nor how that information is dispersed throughout the records." *Id.*[6]

In fact, the Government does release some data from ATS in criminal cases. *See, e.g., United States v. Lam*, No. 3:07-CR-374, 2011 U.S. Dist. LEXIS 33351, at *18 (E.D. Va. March 28, 2011) (discussing data found in columns and rows on ATS document and identifying both suspicious shipping container number and import company's name from the ATS database); *United States v. Reyes-Bernal*, CR No. 10-1365-R, 2011 U.S. Dist. LEXIS 18169, at *2 (C.D. Cal. Feb. 24, 2011) (agent learned through ATS that suspect was subject to an alert, that car had crossed border three other times, and that defendant had crossed the border 10 times in multiple vehicles over the previous 90 days).[7]

Those cases give lie to the notion that all the information in ATS is always secret, that some information cannot be released without causing harm, and that DHS has provided a declaration that sufficiently addresses the true scope of secrecy needed and maintained for ATS.

---

[6] To remedy the error, the *Barnard* court conducted an *in camera* review and ultimately concluded that redaction was not feasible in the documents at issue. *Barnard*, 531 F. Supp. 2d at 140-41. At a minimum, that remedy can be applied here. *See infra Section III.*

[7] It is telling, by contrast, that the documents here are so redacted that they do not even disclose whether there was a similar "alert" for the Journalists, information that reveals no technique or procedure if not tied to a particular factor. Needless to say, knowing whether the questioning was done pursuant to an alert is significant.

# III.

## AT A MINIMUM, THE COURT
## SHOULD CONDUCT AN *IN CAMERA*
## REVIEW OF THE WITHHELD MATERIAL

Because the Government has failed to carry its burden, the withheld material should be released to the public. Alternatively, the Court should exercise its authority to do an *in camera* review to determine that, first, the stops of the Journalists were the result of legitimate law enforcement concerns and not related to their First Amendment-protected activities as members of the press and, second, that no part of the withheld material can be disclosed without revealing law enforcement techniques and procedures.

District courts may initiate *in camera* review at their discretion to assist in analyzing withholding under FOIA. 5 U.S.C. § 552(a)(4)(B). There is no special hurdle to clear for *in camera* inspection: A judge has discretion to order *in camera* inspection "on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a *de novo* determination." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). The Second Circuit has repeatedly affirmed the power of district courts to conduct *in camera* review at their discretion. *See Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 82 (2d Cir. 2002) (conducting *in camera* review of original memorandum on appeal and upholding district court's decision not to order production of memorandum following *in camera* review); *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 483 (2d Cir. 1999) (upholding district court decision based on *in camera* review and noting that petitioner's argument on appeal did not address the district court's *in camera* review of withheld agency records). Even in sensitive national-security cases, the power of the court to inspect documents independently has been recognized by the Second Circuit. As the Second Circuit stated in *Halpern*, 181 F.3d at 295, "deference to . . . a conclusory 'catch-all' assertion is inappropriate" in an Exemption 1 case. *See also Assoc. Press v. U.S. Dep't of*

*Defense*, 498 F. Supp. 2d 707, 711 (S.D.N.Y. 2007) (court review of documents in FOIA case where the Department of Defense failed to provide "sufficient particularization as to allow the Court to make any informed determination of whether any given redaction satisfied" a FOIA exemption); *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 310 (D. Conn. 2008) (*in camera* review is appropriate where agency has failed to provide sufficient detail and explanation so that "the plaintiff and the court can evaluate the propriety of the application of the exemptions invoked").

    *In camera* inspection is particularly appropriate here because the universe of material is so limited: a small number of redactions and two withheld pages. *See Twist v. Ashcroft*, 329 F. Supp. 2d 50, 54 (D.D.C. 2004), *aff'd sub nom. Twist v. Gonzales*, 171 F. App'x 855 (D.C. Cir. 2005) (*in camera* review is especially proper when "the number of documents is relatively small"); *see also Sutton v. IRS*, No. 05 C 7177, 2007 U.S. Dist. LEXIS 299, at *9 n.3 (N.D. Ill. Jan. 4, 2007) ("It would seem considerably easier for an agency to submit the documents for in camera review than going through the task of drafting sufficient affidavits, particularly when the withheld documents are limited in number"). Among other things, *in camera* review permits the courts to determine whether all segregable parts of the documents have been released, a concern that is clearly in play here with the ATS Records.

## CONCLUSION

For each and every of the reasons set forth above, the Journalists respectfully ask this Court to (i) deny DHS's motion for summary judgment; (ii) grant the Journalists' cross-motion for summary judgment or, in the alternative, order *in camera* review; (iii) award the Journalists the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by FOIA; and (iv) grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
May 12, 2014

Respectfully submitted,

/s/ David E. McCraw
David E. McCraw, Esq.
D. Victoria Baranetsky, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

Attorneys for Plaintiffs