UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MAC WILLIAM BISHOP and         :
CHRISTOPHER CHIVERS,

                                    :

              Plaintiffs,       :        OPINION AND ORDER

                                    :

           -v.-               :        13 Civ. 8620 (GWG)

                                    :

UNITED STATES DEPARTMENT OF,    :
HOMELAND SECURITY

                                    :

              Defendant.     :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Mac William Bishop and Christopher Chivers have brought this suit under the

Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), against the United States Department of

Homeland Security ("DHS") to obtain records relating to the questioning of plaintiffs at John F.

Kennedy International Airport in May and June 2013.  The parties have each moved for

summary judgment.[1]  They have also consented to disposition of the case by a United States

---

     [1] See Notice of Motion for Summary Judgment, filed Apr. 21, 2014 (Docket # 16);
Memorandum of Law in Support of the Defendant's Motion for Summary Judgment, filed Apr.
21, 2014 (Docket # 17) ("DHS Mem."); Declaration of Laurence E. Castelli, filed Apr. 21, 2014
(Docket # 18) ("Castelli Decl."); Plaintiffs' Cross-Motion for Summary Judgment, filed May 12,
2014 (Docket # 19); Plaintiffs' Memorandum of Law in Support of Their Cross-Motion for
Summary Judgment And in Opposition to Defendant's Motion for Summary Judgment, filed
May 12, 2014 (Docket # 20) ("Pl. Mem."); Declaration of David E. McCraw in Support of
Plaintiffs' Cross-Motion for Summary Judgment And in Opposition to Defendant's Motion for
Summary Judgment, filed May 12, 2014 (Docket # 21) ("McCraw Decl."); Reply Memorandum
in Further Support of the Defendant's Motion for Summary Judgment, filed June 2, 2014
(Docket # 22) ("DHS Reply"); Supplemental Declaration of Laurence E. Castelli, filed June 2,
2014 (Docket # 23) ("Supp. Castelli Decl."); Reply Memorandum of Law in Further Support of
Plaintiffs' Cross-Motion for Summary Judgment And in Opposition to Defendant's Motion for
Summary Judgment, filed June 12, 2014 (Docket # 24) ("Pl. Reply").

      Among DHS's submissions is a "Vaughn Index" which "includes an explanation of the

Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, DHS's motion is granted and plaintiffs' motion is denied.

I.     BACKGROUND

Mac William Bishop and Christopher Chivers are reporters for The New York Times who on May 24, 2013, went to John F. Kennedy International Airport ("JFK") to board a flight to Turkey to report on the civil war in Syria.  See McCraw Decl. ¶¶ 1, 3.  While waiting at the boarding gate, Bishop and Chivers were pulled aside, taken to a separate room, and questioned individually by DHS employees.  See id. ¶ 4.  Upon returning to the United States from Turkey on June 6, 2013, Chivers was again subjected to such "segregated" questioning by DHS employees at JFK.  See id.

In June and July 2013, Chivers and Bishop sent separate FOIA requests to DHS headquarters "seeking all information and records in the possession of DHS concerning" them. Id. ¶¶ 5, 11; see Privacy Act Request/Christopher Chivers, dated June 27, 2013 (annexed as Ex. B to McCraw Decl.); Privacy Act Request/Mac William Bishop, dated July 10, 2013 (annexed as Ex. G to McCraw Decl.).  After DHS asserted that it could not locate any responsive documents, plaintiffs made significant efforts, by means of letters and appeals within the agency, to persuade DHS to continue its search.  See McCraw Decl. ¶¶ 6-10, 13-18; see also Privacy Act Request/Christopher Chivers, dated Aug. 9, 2013 (annexed as Ex. D to McCraw Decl.); Bishop FOIA Appeal, dated Oct. 28, 2013 (annexed as Ex. I to McCraw Decl.); Privacy Act

FOIA exemptions claimed for the contested records."  Castelli Decl. ¶ 15; see DHS Vaughn Index (annexed as Ex. A to Castelli Decl.) ("Vaughn Index").  See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973); see also John Doe Agency v. John Doe Corp., 493 U.S. 146, 149 n.2 (1989) (A Vaughn Index "usually consists of a detailed affidavit, the purpose of which is to permit the court system effectively and efficiently to evaluate the factual nature of disputed information.") (internal quotation marks and citation omitted).

Request/Mac William Bishop, dated Aug. 9, 2013 (annexed as Ex. L to McCraw Decl.).  As a

result of plaintiffs' persistence, which continued even after they filed their complaint in this case,

DHS identified numerous responsive documents.  See McCraw Decl. ¶ 20; Castelli Decl.

¶¶ 11, 14.  Many of the documents were produced with redactions, however, and some were

withheld in their entirety.  See McCraw Decl. ¶¶ 20-21.  The identified documents all emanate

from the same division of DHS: U.S. Customs and Border Protection ("CBP").  See generally

Castelli Decl. ¶¶ 16-21.  Plaintiffs have chosen not to challenge some of the withholdings by

DHS, and thus, the disputes remaining in this case are narrow.

      A.     The Relevant Documents

      The documents at issue come from either CBP's "TECS" computer system or CBP's

Automated Targeting System ("ATS") database.  With regard to the TECS documents, CBP

"Privacy Officer" Laurence E. Castelli, see Castelli Decl. ¶ 1, explains that

> TECS (not an acronym) is an overarching law enforcement information
> collection, analysis and sharing environment, comprised of several modules
> designed to collect, maintain and screen data as well as conduct analysis,
> screening and information sharing to facilities the law enforcement and
> antiterrorism mission of CBP . . . . [It] is used by CBP primarily to track
> individuals who have violated or are suspected of violating a law or regulation
> enforced or administered by CBP, provides a record of any inspection conducted
> at the border and assists officers in determining admissibility of persons arriving
> in the United States.

Id. ¶ 8.  "TECS query capabilities can be used to analyze data from various sources to assist

authorized users in the identification of areas of law enforcement interest, concern, or

relationships indicating the possible presence of such interests/concerns."  Supp. Castelli Decl.

¶ 2 (citation omitted).

      With regard to the ATS documents, Castelli explains that ATS stores passenger name

records, see Castelli Decl. ¶ 12, and contains a "module" maintaining data on "persons traveling

to and from the United States on commercial air carriers," id. ¶ 13.  This module "provides an hierarchical system that allows DHS personnel to focus efforts on potentially high-risk passengers by eliminating labor-intensive manual reviews of traveler information or interviews with every traveler."  Supp. Castelli Decl. ¶ 7.  The module reflects an "assessment process" that is "based on a set of uniform and user-defined rules based on specific optional, tactical, intelligence, or local enforcement efforts."  Id.  The module "augments the CBP officer's decision-making process about whether a traveler or crew member should receive additional screening" and "provides an automated solution that allows CBP personnel to focus efforts on potentially high-risk travelers by eliminating labor-intensive manual comparison of traveler information or interviews with every traveler."  Id. ¶ 8.

> Castelli explains:
>
> ATS is a decision support tool that compares traveler, cargo, and conveyance information against law enforcement, intelligence, and other enforcement data using risk-based targeting scenarios and assessments.  ATS was designed to efficiently perform risk assessments on information pertaining to international travelers and shipments arriving in or departing the United States.  ATS uses a rule-managed technology that facilitates the targeting of high-risk travelers and cargo . . . .
>
> ATS compares existing information on individuals and cargo entering and existing the country with patterns identified as requiring additional security.  The patterns are based on CBP officer experience, analysis of trends of suspicious activity, and raw intelligence corroborating those trends . . . .
>
> Specifically, [the module] combines the information provided by airlines with law enforcement and intelligence information, and displays this combined data in a law-enforcement-sensitive format, showing the importance that CBP places on different elements and factors in making law enforcement decisions, as well as the law-enforcement-sensitive information underlying such decision-making.

Castelli Decl. ¶¶ 21-23.

B.     The Contested Redactions and Withholdings

Plaintiffs dispute redactions made to "passenger activity" and "hit data" records from the TECS system.  See Redacted Documents (annexed as Ex. C to Castelli Decl.) ("Red. Doc."), at CBP0002-CBP0014, CBP0029, CBP0099, CBP0110-CBP0115, CBP0119.  These records contain columns for the passenger's name and date of birth, followed by columns headed "date," "time," "agn," "rslt," "typ," "ref," "lane," "api" and "dim."  The letters and numbers appearing under each of these columns (most of which have no obvious meaning) have been released with the exception of the information under "RSLT," which has room for about four characters. Plaintiffs challenge the redactions made in the RSLT field.

An additional area of dispute relates to redactions in the "secondary inspection records," which also emanate from TECS.  See id. at CBP0091-CBP0093, CPB0140-CBP0143.  In these records, redactions have been made to the "Referring Officer Code," "Reason for Referral," and "Remarks" fields.  Additionally, a small amount of text — no more than 30 characters — has been redacted from the section entitled "Inspection Remarks."[2]  Plaintiffs challenge only the redactions in the "Reason for Referral" field and the "Inspection Remarks" section.  See Pl. Mem. at 12.

Plaintiffs' remaining objection is to DHS's withholding of two entire pages of records from ATS.  See Castelli Decl. ¶ 24; Red. Doc. at CBP0265-CBP0266.  Castelli asserts in his declaration that these pages "were compiled for law enforcement purposes in that the information was collected and used by CBP in its mission to secure the border of the United

---

[2] The bulk of the "Inspection Remarks" section has not been redacted.  For example, in one of these records, the unredacted portion of this section states: "PAX is reporter for NY Times traveling to Hatay Turkey and then on to Syria and finally to Iraq."  Red. Doc. at CBP 0092.

States."  Castelli Decl. ¶ 24.

DHS has claimed the exemption in 5 U.S.C. § 552(b)(7)(E) as the basis for all of these redactions and withholdings.  See Vaughn Index; see also Castelli Decl. ¶¶ 19-21.  At the Court's request, see Order, filed July 17, 2014 (Docket # 25), DHS submitted the withheld material for in camera review, see Letter from Jean-David Barnea, filed July 17, 2014 (Docket # 26).  The Court has thus reviewed all of the disputed records in unredacted form.

II.    LAW GOVERNING FOIA ACTIONS

FOIA's general purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); accord Nat'l Archives & Record Admin. v. Favish, 541 U.S. 157, 171 (2004) (explaining that the purpose of FOIA is to allow the general public to learn "what their Government is up to") (internal quotation marks and citation omitted); Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 283 (2d Cir. 2009) ("[FOIA] was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.") (citation and internal quotation marks omitted).  FOIA favors broad disclosure and "any member of the public is entitled to have access to any record maintained by a federal agency, unless that record is exempt from disclosure under one of the Act's nine exemptions."  A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 143 (2d Cir. 1994); accord Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 147 (2d Cir. 2010); Associated Press, 553 F.3d at 283; Garcia v. U.S. Dep't of Justice, 181 F. Supp. 2d 356, 369 (S.D.N.Y. 2002).  Federal courts conduct a de novo review of an agency's decision to withhold records requested under FOIA, Bloomberg, 601 F.3d at 147, and all statutory exemptions must be construed narrowly, id.; see also Associated Press, 554 F.3d at 283.  Agency

6

information falling within the terms of a FOIA exemption, however, need not be disclosed.  See,

e.g., Associated Press, 554 F.3d at 283-84; Halpern v. FBI, 181 F.3d 279, 287 (2d Cir. 1999).

To prevail on a motion for summary judgment in a FOIA action, the government has "the

burden of showing that . . . any withheld documents fall within an exemption to the FOIA."

Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994); accord U.S. Dep't of Justice v.

Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989); Bloomberg, 601 F.3d at

147; Associated Press, 554 F.3d at 283.  Summary judgment may be granted on the basis of

affidavits or declarations "supplying facts . . . giving reasonably detailed explanations why any

withheld documents fall within an exemption."  Carney, 19 F.3d at 812; accord Associated Press

v. U.S. Dep't of Justice, 549 F.3d 62, 65 (2d Cir. 2008).

III.   DISCUSSION

DHS claims that its redactions and withholdings are justified under Exemption 7(E) of

FOIA.  See Vaughn Index.  Exemption 7(E) protects from disclosure "records or information

compiled for law enforcement purposes, but only to the extent that the production of such law

enforcement records or information . . . would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

A threshold requirement for the application of  Exemption 7(E) is that the documents

must be "compiled for law enforcement purposes."  DHS contends this requirement is met

because the documents "reflect information from law enforcement databases" and because that

information "is collected and used by CBP in its mission to secure the border of the United

States."  DHS Mem. at 5 (citing Castelli Decl. ¶¶ 8, 13, 17, 24).  Plaintiffs do not dispute DHS's

7

contention on this point, and we agree that these documents satisfy the "law enforcement purposes" requirement inasmuch as they pertain to CBP's attempts to control the borders and identify potential criminal activity or illegal immigration.  See generally Am. Immigration Council v. U.S. Dep't of Homeland Sec., 2014 WL 1118353, at *5 (D.D.C. Mar. 21, 2014) (CBP documents satisfied the law enforcement purposes requirement where "the withheld records ha[d] a rational nexus to the agency's law-enforcement duties, including the prevention of terrorism and unlawful immigration"); Concepcion v. U.S. Customs & Border Prot., 907 F. Supp. 2d 133, 140-41 (D.D.C. 2012) (finding that CBP's "Passenger Activity report regarding [the plaintiff] is a law enforcement record within the scope of Exemption 7").

Once this threshold requirement is satisfied, a court must determine if either of Exemption 7(E)'s "two alternative clauses" applies.  See Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010).  That is, Exemption 7(E) protects from disclosure "either (1) techniques and procedures for law enforcement investigations, or (2) guidelines for law enforcement investigations if disclosure of such guidelines could reasonably be expected to risk circumvention of the law."  Ahmed v. U.S. Citizenship & Immigration Servs., 2013 WL 27697, at *4 (E.D.N.Y. Jan. 2, 2013) (internal quotation marks and citation omitted).  The Second Circuit has explained the distinction between "techniques and procedures" and "guidelines" as follows:

> The term "guidelines" — meaning, according to Webster's Third New International Dictionary (1986), "an indication or outline of future policy or conduct"— generally refers in the context of Exemption 7(E) to resource allocation.  For example, if a law enforcement agency concerned with tax evasion directs its staff to bring charges only against those who evade more than $100,000 in taxes, that direction constitutes a "guideline."  The phrase "techniques and procedures," however, refers to how law enforcement officials go about investigating a crime.  See Webster's Third New International Dictionary (1986) (defining "technique" as "a technical method of accomplishing a desired aim"; and "procedure" as "a particular way of doing or of going

8

about the accomplishment of something").  For instance, if the same agency informs tax
investigators that cash-based businesses are more likely to commit tax evasion than other
businesses, and therefore should be audited with particular care, focusing on such targets
constitutes a "technique or procedure" for investigating tax evasion.

Lowenstein, 626 F.3d at 682.

DHS argues that the claimed redactions qualify under both the first and second clauses of

Exemption 7(E).  See DHS Mem. at 5-11.

A.      RSLT Field Redactions

The Court first considers whether Exemption 7(E) applies to DHS's redaction of the

RSLT field, which are contained in the "passenger activity and 'hit data'" printouts from the

TECS records.  The issue before us is whether DHS has provided "reasonably detailed

explanations" that justify its reliance on Exemption 7(E).  Carney, 19 F.3d at 812; see also

Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 73 (2d Cir. 2009) ("Summary judgment is warranted

on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure

with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith.") (internal quotation marks and citation omitted).  Ultimately, "an

agency's justification for invoking a FOIA exemption is sufficient if it appears logical or

plausible."  Wilner, 592 F.3d at 73 (internal quotations marks and citation omitted).

 The sworn declarations from Castelli assert that the purpose of the TECS system is to

"collect, maintain and screen data as well as conduct analysis, screening and information sharing

to facilitate the law enforcement and antiterrorism mission of CBP," to "track individuals who

have violated or are suspected of violating a law or regulation enforced or administered by

CBP," and to "provide[ ] a record of any inspection conducted at the border and assist officers in

9

determining admissibility of persons arriving in the United States."  Castelli Decl. ¶ 8.  Also,

"TECS query capabilities can be used to analyze data from various sources to assist authorized

users in the identification of areas of law enforcement interest, concern, or relationships

indicating the possible presence of such interests/concerns."  Supp. Castelli Decl. ¶ 2.

   With regard to the redactions of the RSLT fields, Castelli avers that this information

"would reveal (in abbreviated form) the names of the law enforcement databases that were

queried by CBP relating to the two Plaintiffs and the results of those queries" and thus "would

reveal CBP law enforcement and inspection techniques used in the processing of international

travelers, which, if disclosed, would enable potential violators to design strategies to circumvent

the examination procedures developed by CBP."  Id. ¶ 4.  Castelli reiterates that such

information would "reveal the results of specific law enforcement database queries used by

officers in determining if certain law enforcement actions should be conducted."  Castelli Decl.

¶ 19.  Additionally, he attests that producing such information would "permit individuals to alter

their patterns of conduct, adopt new methods of operation, relocate, change associations, and

effectuate other countermeasures, thus, corrupting the integrity of ongoing techniques,

operations and investigations, and potentially compromising officer safety."  Id.

   While unredacted copies of these records have been produced for in camera review, the

actual information contained in the "RSLT" field — consisting of no more than four characters

— is of little meaning to the Court.  Plaintiffs' view is that "some letters or numbers" even when

linked to the other information about a passenger would not "seem to provide any information

about a government technique or procedure of use to a criminal or terrorist" since it would not

"display the calculus used to reach that result or method through which that information was

obtained."  Pl. Mem. at 10.  We disagree.  Requiring the production of this information, which

was returned from a query of law enforcement databases, would plainly "disclose . . . procedures for law enforcement investigations" within the meaning of Exemption 7(E) to anyone who could make sense of the letters or numbers.  It is of no consequence that the meaning of these letters or numbers might not be readily apparent to the average person for two reasons.  First, we cannot assume that material given to a FOIA requester will not become public and there may well be individuals for whom those letters and numbers have meaning.  Second, if numerous records of this sort were made available to the public through FOIA, it is "logical or plausible" that a motivated individual could decipher the true import of the coded information by analyzing the RSLT field data.  For example, a person may be able to identify patterns with regard to CBP's investigative efforts based on characteristics of travelers questioned by CBP.

   We are reinforced in this view by the fact that, when faced with similar factual scenarios, courts have regularly found redactions of this nature to be proper under Exemption 7(E).  See, e.g., McRae v. U.S. Dep't of Justice, 869 F. Supp. 2d 151, 168-69 (D.D.C. 2012) (upholding under Exemption 7(E) redactions of "data displayed on screen prints of TECS, which identifies the terminal from which a query was accomplished" and "information that referred to other law enforcement databases") (internal quotation marks omitted); Bloomer v. U.S. Dep't of Homeland Sec., 870 F. Supp. 2d 358, 369 (D. Vt. 2012) (affording DHS "the usual presumption of good faith" to find that it adequately explained its reliance on Exemption 7(E) for its redactions of "various codes and case numbers" in TECS records); Asian Law Caucus v. U.S. Dep't of Homeland Sec., 2008 WL 5047839, at *4 (N.D. Cal. Nov. 24, 2008) ("Although in some circumstances, simply withholding the names of databases would be improper, in this case, the names of the databases . . . appear within a context in the withheld documents, such that disclosure could lead to circumvention of CBP law enforcement efforts or facilitate improper

11

access to the database for the purpose of frustrating CBP law enforcement functions.") (internal

quotation marks omitted).  At least one other court has upheld the agency's redaction of the

"RSLT" field in TECS documents, although it found that releasing the information would

disclose a "guideline" rather than a technique or procedure.  See Strunk v. U.S. Dep't of State,

905 F. Supp. 2d 142, 148 (D.D.C. 2012) ("[T]he CBP's declarant adequately demonstrates that

release of the codes, as well as the information in the RSLT column, 'would disclose guidelines

for law enforcement investigations or prosecutions[, and that] such disclosure could reasonably

be expected to risk circumvention of the law.'") (quoting 5 U.S.C. § 552(b)(7)(E)).[3]

    B.    Redactions of Secondary Inspection Records

With regard to the Secondary Inspection record redactions, Castelli's declaration explains

---

[3] Even if we were to conclude that releasing the RSLT information would result in the disclosure of a "guideline" rather than a "technique or procedure," we would still reach the same result inasmuch as DHS has shown how such a disclosure "could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  As the Court in Bloomer explained:

> Courts have set "a relatively low bar for the agency to justify withholding" information under Exemption 7(E).  Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011).  The exemption allows for withholding information "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."  Id. [Plaintiff] has not argued that the codes sought to be protected by Exemption 7(E) are free of such risks.  Allowing the government the usual presumption of good faith, and given the liberal standard for application of Exemption 7(E), the court finds that DHS has met its burden.  See, e.g., Abdelfattah v. U.S. Immigration and Customs Enforcement, 851 F. Supp. 2d 141, 145-46 (D.D.C. 2012) (upholding redaction of FBI program codes under Exemption 7(E)).

870 F. Supp. 2d at 369.  Similarly, DHS has explained here how revealing the redacted information could result in individuals changing their behavior to circumvent CBP's screening and risk detection guidelines.  See Castelli Decl. ¶ 19; Supp. Castelli Decl. ¶ 4.

that the redacted information "would reveal other investigative techniques used by CBP, including examination and inspection procedures and internal reporting requirements, which could be used by potential violators to develop countermeasures to evade detection, inspection, and targeting methods." Castelli Decl. ¶ 20. The supplemental declaration states that this information was withheld to "protect the specific results of law enforcement database queries that may prompt CBP to select certain travelers for further examination, and the specific law enforcement techniques that CBP officers use while conducting secondary inspections," and that such information "cannot be disclosed to Plaintiffs without identifying law enforcement techniques, including factors and investigatory material considered by CBP in determining whether individual travelers should be subject to additional scrutiny when they cross the U.S. border." Supp. Castelli Decl. ¶ 5. Castelli further notes that the reason why the "Reason for Referral" data must be redacted is because "[p]ublic awareness of this operational information would aid those who seek to circumvent CBP operations and thus harm the agency's ability to enforce the laws of the United States." Castelli Decl. ¶ 20.

In response, plaintiffs contend that DHS "offers only a conclusory explanation for the redaction[s]" in the Secondary Inspection records. Pl. Mem. at 12. In plaintiffs' view, "[i]t is implausible that a few words of text in a description largely devoted to the Journalists' reporting work, as contained in the Inspection Remarks, could be either that revelatory or that harmful." Id. The Court has examined the redacted information in camera and notes that the redacted material has nothing to do with the journalists' "reporting work," notwithstanding the fact that references to this work appears immediately after the redacted material in the section entitled "Inspection Remarks." Instead, it gives information akin to a "reason for referral." As for the materials in the actual "reason for referral" section, the title of this field accurately describes the

content that follows.  In other words, the redactions at issue identify reasons why a person

traveling through border security is chosen for additional screening.

For the reasons just stated, we conclude that revealing this information would in itself

disclose CBP's law enforcement procedures and techniques.  See Supp. Castelli Decl. ¶ 5.  As

Castelli notes with regard to the material redacted from the "Inspection Remarks" field, it would

disclose specific information about "database queries that may prompt CBP to select certain

travelers for further examination" and "techniques that CBP officers use while conducting

secondary inspections."  Id..[4]

Plaintiffs contend that, in any event, DHS cannot avail itself of Exemption 7(E) because

it has not "address[ed] whether the techniques or procedures are truly unknown to the general

public—a general public that now has a broad understanding of security protocols at airports in

the post-9/11 world."  Pl. Mem. at 12.  Plaintiffs note that "[a] large number of surveillance

techniques have been discussed recently in the public domain, including government

publications."  Id. (citing government publications and newspaper articles about border security).

Additionally, plaintiffs assert that "[t]he public is well aware that since 9/11 the government

collects specific database information on individuals that may lead to further secondary

inspection."  Pl. Reply at 6.

Plaintiffs are correct that "Exemption (b)(7)(E) is limited to 'techniques and procedures

---

[4] Once again, because we deem this information to disclose "techniques" or
"procedures," it is not necessary to address the circumvention issue.  But even if we were to do
so, it is logical and plausible that revealing information about specific reasons why border
security agents refer individuals for additional screening or how the agents conduct the
additional inspections would "aid those who seek to circumvent CBP operations," Castelli Decl.
¶ 20, and "could be used by potential violators to develop countermeasures to evade detection,
inspection, and targeting methods," Supp. Castelli Decl. ¶ 5.

not generally known to the public.'"  Ahmed, 2013 WL 27697, at *4 (quoting Doherty v. U.S.

Dep't of Justice, 775 F.2d 49, 52 & n.4 (2d Cir. 1985)).  "While the government retains the

burden of persuasion that information is not subject to disclosure under FOIA, a party who

asserts that material is publicly available carries the burden of production on that issue."  Inner

City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys., 463 F.3d 239, 245 (2d

Cir. 2006) (internal quotation marks and citation omitted); accord N.Y. Civil Liberties Union v.

Dep't of Homeland Sec., 771 F. Supp. 2d 289, 292 (S.D.N.Y. 2011).  Additionally, it is well-

established that "an agency does not have to release all details concerning law enforcement

techniques just because some aspects of them are known to the public."  ACLU v. U.S. Dep't of

Justice, 2014 WL 956303, at *7 (S.D.N.Y. Mar. 11, 2014) (citation omitted); accord Barnard v.

Dep't of Homeland Sec., 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (finding that Exemption 7(E)

applied even though the techniques were "known to the public to some extent").  Indeed, courts

have acknowledged that "Exemption 7(E) applies even when the identity of the techniques has

been disclosed, but the manner and circumstances of the techniques are not generally known, or

the disclosure of additional details could reduce their effectiveness."  Council on

American-Islamic Relations, Cal. v. F.B.I., 749 F. Supp. 2d 1104, 1123 (S.D. Cal. 2010) (citing

Bowen v. U.S. Food & Drug Admin., 925 F.2d 1225, 1228-29 (9th Cir. 1991)); accord Vazquez

v. U.S. Dep't of Justice, 887 F. Supp. 2d 114, 116 (D.D.C. 2012) ("Even commonly known

procedures may be protected from disclosure if the disclosure could reduce or nullify their

effectiveness.") (internal quotation marks and citation omitted); Church of Scientology of Tex. v.

I.R.S., 816 F. Supp. 1138, 1162 (W.D. Tex. 1993) ("[E]ven if known by the public to some

extent, [the techniques and procedures] are nevertheless exempt if disclosure of the

circumstances of their use could lessen their effectiveness.") (internal quotation marks and

citation omitted).

Having examined the information contained in the withheld documents, we cannot find that the techniques or procedures at issue are generally known to the public.  Certainly, as plaintiffs point out, the public is aware of the fact that CBP engages in the practice of collecting information about travelers and that it uses such information to target some of them for questioning.  However, nothing submitted by plaintiffs suggests that the public has knowledge of the particular techniques or procedures reflected in the redacted fields  — in other words, which databases CBP considers in its targeting process and how such information can lead to the triggering of additional security screening.  Indeed, some of the articles plaintiffs cite suggest that the public is <u>not</u> aware of these internal procedures. <u>See</u> Susan Stellin, <u>Security Check Now Starts Long Before You Fly</u>, N.Y. Times, Oct. 21, 2013, at 1 (annexed as Ex. N to McCraw Decl.) ("It is unclear precisely what information the agency is relying upon to make these risk assessments, given the extensive range of records it can access . . . ."); Michael Sniffen, <u>Feds Rate Travelers for Terrorism</u>, The Washington Post, Nov. 30, 2006, at 2 ("The Homeland Security privacy impact statement added that 'an individual might not be aware of the reason additional scrutiny is taking place, nor should he or she' because that might compromise the ATS' methods.").  Moreover, while the public may already know that CBP collects personal information about travelers for risk-assessment purposes, there is no indication that this general understanding undermines the effectiveness of CBP's targeting and inspection procedures.  On the other hand, it is easy to see how providing the public with information about what specific actions or individual characteristics trigger additional security measures would assist individuals

in avoiding being targeted, thus frustrating the effectiveness of CBP's border security measures.[5]

     For these reasons, the Court concludes that the information at issue is not generally known to the public, and thus, that DHS properly relied on Exemption 7(E) in redacting the Secondary Inspection records.

     C.    <u>Withholding of ATS Records</u>

     Finally, the Court finds that DHS properly relied on Exemption 7(E) in withholding the two pages of ATS documents.  Plaintiffs argue that DHS has not justified its reliance on the Exemption because it has provided "no description of what the two documents . . . are" and has failed to answer "essential questions" such as when they were created, and whether "they [are] generic documents about the ATS factors or . . . contain specific information about the Journalists."  Pl. Mem. at 14-15.  Additionally, plaintiffs contend that DHS "has not seriously addressed whether information in the ATS Records can be segregated from data that would expose secret investigative techniques."  <u>Id.</u> at 16.

     As explained in the Castelli declaration, "ATS is a decision support tool that compares traveler, cargo, and conveyance information against law enforcement, intelligence, and other enforcement data using risk-based targeting scenarios and assessments" to aid in the "targeting of high-risk travelers and cargo."  Castelli Decl. ¶ 21.  Additionally, "ATS compares existing

---

     [5] In their reply brief, plaintiffs assert that "similar documents were released by the Government in a case settled just two years ago."  Pl. Reply at 6 (citing <u>House v. Napolitano</u>, 2012 WL 1038816 (D. Mass. Mar. 28, 2012)).  Specifically, plaintiffs assert that in <u>House</u> the "government disclosed numerous documents, including DHS 'Lookout' report telling agents to stop Plaintiff as he entered the country at airport and reports on DHS agents' questioning of plaintiff."  <u>Id.</u>  Having reviewed the <u>House</u> opinion, the Court cannot find that the Government produced documents in that case similar to the ones in our case.  Nothing in plaintiffs' submissions supports such a conclusion either.  Finally, even if plaintiffs could show that similar documents had been produced to the <u>House</u> plaintiff, this would not show that the information at issue in our case is "generally known to the public."

information on individuals and cargo entering and exiting the country with patterns identified as requiring additional scrutiny . . . based on CBP officer experience, analysis of trends of suspicious activity, and raw intelligence corroborating those trends."  Id. ¶ 22.  With regard to the two documents withheld here, Castelli attests that they "were compiled for law enforcement purposes in that the information was collected and used by CBP in its mission to secure the border of the United States," id. ¶ 24, and that the information contained within the documents cannot be disclosed without "revealing critical law enforcement techniques, including factors that are considered in identifying individuals who will be subject to additional review," id. ¶ 25. In the supplemental declaration, Castelli clarifies that the withheld ATS documents are specific to plaintiffs and that one of the documents is responsive to Bishop's request while the other is responsive to Chivers' request.  See Supp. Castelli Decl. ¶ 6.

Here, as in the case of the Secondary Inspection Reports, it is clear from the Court's examination of the documents in camera and DHS's own explanation that the information contained in these documents cannot be revealed without identifying which factors CBP weighs in targeting travelers and in deciding which travelers should be subjected to additional screening. Thus, the matters withheld would disclose law enforcement techniques and procedures. Moreover, if revealed, such information could be used by "potential violators to develop countermeasures to evade detection, inspection, and targeting methods," and consequently, "the release [of this information] . . . would significantly compromise CBP's effectiveness in detecting and preventing violations of U.S. law."  Id. ¶ 11.  Courts have routinely protected law enforcement documents that contain information used for the purpose of identifying potential targets of investigation.  See, e.g., Hasbrouck v. U.S. Customs & Border Prot., 2012 WL 177563, at *3 (N.D. Cal. Jan. 23, 2012) (finding that CBP could rely on Exemption 7(E) to avoid

18

"disclosure of the list of 'personal' or 'unique' identifiers by which data can be retrieved from an individual's ATS . . . and TECS records"); McCoy v. Moschella, 1991 WL 212208, at *5 (D.D.C. Sept. 30, 1991) (FBI properly claimed Exemption 7(E) where disclosure of the documents "would permit a sophisticated requester to identify the characteristic information used by the FBI to categorize similar robberies for the purposes of subject identification . . . [and] in turn, would permit bank robbers to avoid specific identifying patterns of activity, thus making the FBI's task of identifying logical subjects more difficult"); see also Soghoian v. U.S. Dep't of Justice, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) ("Knowing what information is collected, how it is collected, and more importantly, when it is not collected, is information that law enforcement might reasonably expect to lead would-be offenders to evade detection.") (citing Blackwell, 680 F. Supp. 2d at 92).

While plaintiffs criticize DHS for not including more details about the withheld ATS documents such as the type of information they contain and from which sources the  information is obtained, see Pl. Reply at 2-3, the Court understands how even these questions cannot be answered without revealing CBP's procedures.  Given that the documents pertain to CBP's "assessment" and "analysis" of certain data to identify "trends of suspicious activity," Castelli Decl. ¶¶ 21-22, even stating whether these documents contain "merely factual compilations" or instead "conclusions drawn by DHS agents," Pl. Reply at 2-3, could expose the nature of the ATS system.  The Court's review of the withheld ATS documents in camera confirms that they qualify for protection under Exemption 7(E).

Plaintiffs argue that even if the documents contain some information deserving of protection under Exemption 7(E), DHS has not fulfilled its obligation of segregating such information and producing redacted documents containing the non-exempt information.  See Pl.

Mem. at 15-17.

"Under FOIA, the defendant agency must disclose '[a]ny reasonably segregable portion of a record . . . after deletion of the portions [that] are exempt.'"  Shinnecock Indian Nation v. Kempthorne, 652 F. Supp. 2d 345, 369 (E.D.N.Y. 2009) (quoting 5 U.S.C. § 552(b)).  While "the agency must provide a detailed justification for its decision that non-exempt material is not segregable," at the same time, "[t]he agency is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material."  Conti v. U.S. Dep't of Homeland Sec., 2014 WL 1274517, at *25 (S.D.N.Y. Mar. 24, 2014) (citations omitted); see also Roman v. C.I.A., 2012 WL 6138487, at *7 (E.D.N.Y. Dec. 11, 2011) ("While an agency must provide a detailed justification and not conclusory statements to support its position that the non-exempt material cannot be reasonably segregated, it also should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information."). "Non-exempt portions of a document may only be withheld if they are 'inextricably intertwined' with the exempt portions."  Conti, 2014 WL 1274517, at *25 (quoting Inner City Press, 463 F.3d at 249 n.10); see also Assadi v. U.S. Citizenship & Immigration Servs., 2013 WL 230126, at *4 (S.D.N.Y. Jan. 22, 2013) (in discussing FOIA Exemption 5, noting that "[p]urely factual observations are not protected by the privilege, unless those observations are inextricably intertwined with the privileged opinion or recommendation such that disclosure would compromise the confidentiality of deliberative information that is entitled to protection under [the Exemption]") (internal quotation marks, brackets, and citation omitted).

Here, DHS has explained that "[n]o further information derived from ATS . . . can be segregated and produced to [plaintiffs] without disclosing law-enforcement sensitive information, including but not limited to the mission-critical ATS assessment process and user-

20

defined rules" and that "[d]isclosure of this information would reveal law enforcement techniques, including factors and investigatory material considered by CBP when identifying potentially high-risk travelers who may be subject to additional scrutiny when they cross the U.S. border."  Supp. Castelli Decl. ¶ 11.  Based on DHS's explanation together with our own in camera review of the withheld documents, the Court agrees that DHS cannot reasonably segregate any of the factual statements in the ATS documents because such statements are so "inextricably intertwined" with the documents' purpose of evaluating and "identifying potentially high-risk travelers" that disclosing any of this information risks revealing the nature of the exempt portions of the documents.  In other words, to the extent that any purely factual information is contained in the withheld documents, it was proper for DHS not to disclose such information because doing so would implicitly suggest that such factors played a role in CBP's analysis.[6]  Cf. Assadi, 2013 WL 230126, at *5 (after reviewing withheld documents in camera, concluding that none of the "purely factual material" could be disclosed because "disclosure would shed light on an otherwise exempt evaluation process"); Ahmed, 2013 WL 27697, at *6 ("To the extent there is any purely factual or otherwise non-exempt material in these documents, the Court finds that such material is inextricably intertwined with exempt material, such that disclosure would compromise the confidentiality of protected information.") (internal quotation marks and citation omitted).

Accordingly, because DHS could not have reasonably segregated and produced any non-

---

[6] The Court notes that it is of no moment that "the Government does release some data from ATS in criminal cases."  Pl. Mem. at 17 (citing cases).  Indeed, DHS has explicitly acknowledged that "an individual may generally be provided, as they were provided in this case, access to certain information in ATS."  Supp. Castelli Decl. ¶ 10.  That some ATS documents can be produced without revealing sensitive information has no bearing on whether the two documents at issue have any facts that can be revealed without disclosing exempt information.

exempt information, the Court finds that DHS properly relied on Exemption 7(E) in withholding the two ATS documents in their entirety.

IV.    CONCLUSION

For the foregoing reasons, DHS's motion for summary judgment (Docket # 16) is granted, and plaintiffs' motion for summary judgment (Docket # 19) is denied.  The Clerk is requested to enter judgment dismissing the complaint.

SO ORDERED.

Dated: September 16, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

22